IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

JIMMIE LEE LONG,                    )
                                    )
            Plaintiff,              )
                                    )
      v.                            )      CASE NO. 3:09-CV-90-WKW [WO]
                                    )
RUSSELL COUNTY COMMISSION,          )
*et al.*,                           )
                                    )
            Defendants.             )
_____    )
                                    )
HOVET DIXON,                        )
                                    )
            Plaintiff,              )
                                    )
      v.                            )      CASE NO. 3:09-CV-96-WKW [WO]
                                    )
RUSSELL COUNTY COMMISSION,          )
                                    )
            Defendant.              )

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Jimmie Lee Long and Hovet Dixon, former county employees, bring this

consolidated 42 U.S.C. § 1983 action, alleging race discrimination and retaliation under the

Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  Mr.

Long also seeks relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e

to 2000e-17 ("Title VII").  The Russell County Commission ("the Commission") is a

defendant in both actions, and Mr. Long also names Harry Ennis, county engineer, as a

defendant in his individual capacity.[1]  (Long Compl. (Doc. # 1); Dixon Am. Compl. (Doc. # 26).)[2]  This cause is before the court on Defendants' Motions for Summary Judgment (Long Doc. # 34; Doc. # 60), which have been fully briefed and are ready for adjudication. Upon careful consideration of counsels' arguments, the relevant law, and the record as a whole, the court finds that Defendants' motions are due to be granted.

## I.  JURISDICTION AND VENUE

Subject matter jurisdiction is exercised pursuant to 28 U.S.C. §§ 1331 and 1343.  The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations in support of both.

## II.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (*per curiam*) (quoting Fed. R. Civ. P. 56(a)).  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its

---

[1]  The Complaint names Mr. Ennis only as a defendant with respect to Mr. Long's § 1983 claims, and appropriately so.  *See Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991) (holding that individual capacity suits under Title VII are inappropriate:  "The relief granted under Title VII is against the *employer*, not individual employees whose actions would constitute a violation of the Act.").

[2]  For convenience, the court will generally cite to documents from Mr. Dixon's case, No. 3:09cv96-WKW.  Any citations to documents from Mr. Long's case, No. 3:09cv90-WKW, will be in the following format: (Long Doc. # ___).

motion, and identifying those portions of [the record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24.

If the movant meets its evidentiary burden, the burden shifts to the nonmoving party to establish, with evidence beyond the pleadings, that a genuine issue material to each of its claims for relief exists. *Celotex Corp.*, 477 U.S. at 324; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). What is material is determined by the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (*per curiam*) (internal quotation marks and citation omitted).

A genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263; *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001). However, if the evidence on which the nonmoving party relies "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50

(citations omitted).  "A mere 'scintilla' of evidence supporting the [nonmovant's] position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party," *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990), and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and do not suffice to oppose a motion for summary judgment. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (*per curiam*).  Hence, when a plaintiff fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party.  *Celotex Corp.*, 477 U.S. at 323.

On summary judgment, the facts must be viewed in the light most favorable to the non-movant.  *See Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002).  Hence, "'facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case.'"  *Id.* (quoting *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000)).

## III.  FACTUAL AND PROCEDURAL BACKGROUND

The evidence, construed in the light most favorable to Plaintiffs, establishes the following facts:

A.      **Mr. Long's Employment**

Mr. Long, a black male, accepted a "common labor" position in the Russell County Highway Department ("Highway Department") in 1990, at the age of forty.[3]  (Long Dep. 40 (Doc. # 71, Ex. 1).)  His duties initially consisted of digging ditches and laying pipe.  (Long Dep. 40.)  Using his prior experience as an automobile mechanic and truck driver, Mr. Long quickly began operating heavy equipment, advancing first to dump truck driver and then to operator.  (Long Dep. 41.)  In 1993, Mr. Long was promoted to Assistant Foreman.  In 1994, Mr. Long attained the position of Road Foreman.  (Sanders Dep. 27 (Doc. # 72, Ex. 8).)   In this role, he supervised a road crew of approximately nine people and continued to operate heavy equipment.  (Long Dep. 42-45.)

B.      **Mr. Dixon's Employment**

Mr. Dixon, a black male known by his colleagues as "Preacher" or "Preach,"[4] began working as a dump truck driver for the Highway Department in March 1990, at the age of thirty-six.  (Dixon Dep. 9, 35, 40, 46, 96-97 (Doc. # 71, Ex. 2).)  Three years later, in 1993, Mr. Dixon obtained his commercial driver's license and began operating heavy equipment.  (Dixon Dep. 50-51.)  He took advantage of training classes and worked during his breaks to teach himself how to operate the equipment, which included excavators, bulldozers, and

---

[3] Mr. Long was first employed by the Commission in 1969 at the age of nineteen. He worked on a grass crew until he was terminated in 1972 when a County Commissioner found him resting after being stung by a swarm of bees.

[4] Mr. Dixon is a pastor at Mount Hebron Church in Seale, Alabama.  (Dixon Dep. 97.)

backhoes.  (Dixon Dep. 175-76.)  Approximately two years later, around 1995, Mr. Dixon was promoted to Road Foreman.  (Dixon Dep. 54-58, 79.)  In this role, he supervised a road crew of approximately nine people and continued to operate heavy equipment.  (Dixon Dep. 56, 178.)

## C.   **Department Hierarchy**

The Department management changed often.  According to Mr. Long, at least some of these changes resulted from a series of anonymous complaints.[5]  (Long Dep.  229-30.)  During nearly two decades of concurrent employment with the Highway Department, Mr. Long and Mr. Dixon worked under several different supervisors.  Both men reported directly to the assistant county engineer and/or superintendent, who reported to the county engineer.  The county engineers during Mr. Long's tenure were, in this order:  James McGill, Cal Markert, Harry Ennis, Rick Gohde, and Harry Ennis again.  (Dixon Dep. 59-63.)  Mr. Dixon served under the same county engineers, in addition to Larry Kite, who attained the position in 2008.  (Dixon Dep. 54-55, 59; Larry Kite Dep. 11 (Doc. # 72, Ex. 7).)  Mr. Long's direct supervisors included, in this order:  Arthur "Buster" Sanders (superintendent), Ted Talley (superintendent), and Norman Priest (superintendent).  Mr. Dixon served under the same direct supervisors, in addition to Chris Camp, who was assistant engineer under Rick Gohde,

---

[5] Plaintiffs contend that these complaints related to racial discrimination; however, those contentions will not be credited because Plaintiffs do not cite any evidence regarding the substance of the complaints.  *See* Fed. R. Civ. P. 56(c).

and Anthony Calhoun, who became superintendent after Mr. Long's termination.  (Priest Dep. 25-26 (Doc. # 73, Ex. 15); Calhoun Dep. 26-27 (Doc. # 73, Ex. 17).)

**D.     Trouble Within the Department**

According to Plaintiffs, trouble began in 2000, when the Commission hired Mr. Markert as the county engineer.  (Long Dep. 49-50; Dixon Dep. 75.)  Mr. Dixon testified that after Mr. Markert was hired, "certain groups" of employees received preferential treatment regarding salary and other benefits.  (Dixon Dep. 109 ("Like, a certain group over here was getting what they want, and this group over here was asking but couldn't get it.").)  Mr. Dixon acknowledged that the group receiving preferential treatment was "mixed," consisting of both black and white employees.  (Dixon Dep. 109-10.)  Beyond the preferential treatment given to some "groups," he also noticed that newer employees received better pay and that raises were distributed to some, but not all, employees.  (Dixon Dep. 110-17.)   He further testified that black employees were regularly passed over for promotions for white applicants with little experience.  (Dixon Dep. 76, 103-04.)  According to Mr. Dixon, "everybody" complained about this perceived discrimination against black employees.  (Dixon Dep. 105-06.)   Numerous black employees testified about witnessing or experiencing unequal treatment or harassment on the basis of their race.  (*See, e.g.*, Moffet Decl. (stating that different education standards were applied to black employees and that only black employees were subject to random drug tests); Hall Decl. (stating that he experienced "intimidation on at least eight occasions").)

Sometime in late 2003, Buster Sanders retired from his position as superintendent. (Sanders Dep. 9 (Doc. # 72, Attach. 8).)  Mr. Long thought that he would be considered for the position since he was the "next man" in line, but he had also heard "[through] the grapevine [that] they were going to bring somebody else in . . . ."  (Long Dep. 61.)  Mr. Long decided to approach Mr. Markert about the job opening.  At first, Mr. Markert refused to interview Mr. Long, telling him that he had already found someone to fill the position.  (Long Dep. 67.)  Mr. Long then sent a letter to the County Commissioners asking "for a chance at [the position]."  (Long Dep. 68-69.)  Soon thereafter, Mr. Markert called Mr. Long into his office for the interview.  According to Mr. Long, Mr. Markert greeted him with: "[The Commission] told me I need to interview you for this job."  (Long Dep. 74.)

The interview itself was off-topic.  Instead of focusing on the duties of a superintendent, which are to oversee the Road Foremen and their crews  (Sanders Dep. 10), Mr. Markert asked Mr. Long a series of questions about bridge inspection (Long Dep. 85).  When Mr. Long responded that inspecting bridges was the responsibility of the engineer's office, Mr. Markert "started smiling at [him]."  (Long Dep. 86.)  Mr. Markert tape-recorded Mr. Long's interview, contrary to his normal practice, because he "wanted to make sure the truth was there."[6]  (Markert Dep. 53 (Long Doc. # 45, Ex. 3).)  Mr. Markert also took notes, marking Mr. Long as having stated during the interview that he, Mr. Markert, was not

---

[6]  Prior to this, Mr. Long had made a remark to Mr. Markert suggesting that the latter was racially biased, *infra* at 32.

racially biased, a statement which Mr. Long denies having made during the interview.[7] (Long Dep. 95.)  Ultimately, Mr. Long was passed over in favor of an outsider named Ted Talley, who was awarded the position.  Mr. Talley is a white male who had been working as a supervisor at a cotton mill in the area.  Mr. Talley had no experience in road work or construction.  (Markert Dep. 55-57.)

In 2005, the Commission hired Mr. Gohde as the county engineer and Mr. Priest as the superintendent below him.  Mr. Long testified that Mr. Priest stated that "he had been brought [t]here to straighten things out."  (Long Dep. 236.)  After meeting the supervisors (all but one of whom was black), Mr. Priest inquired whether all the supervisors were black. (Long Dep. 234-35.)  Shortly thereafter, Henry West overheard Mr. Gohde say that "[t]here are too many black supervisors."  (West Decl. Pt. 2 (Doc. # 73, Attach. 9).)[8]

According to Mr. Long, he, Mr. Dixon, and four other black employees met with the Commission's Chairman, Assistant Chairman, and County Attorney in July 2007, to discuss the perceived harassment and discrimination within the Transportation Department.  (Long Dep. 257-59.)  Race was not mentioned specifically during this meeting; however, Plaintiffs maintain that, given the racial makeup of the employees, it was obvious that race was the underlying issue and the basis for the complaints.  (Pls.' Resp. Br. 12 (Doc. # 70).)  After this

---

[7] The tape of the interview would presumably resolve this immaterial dispute, *see infra* at IV.D.1.a.

[8] Mr. Long testified that someone named "F.O." told Mr. Long that he had overheard *Norman Priest* say that there were too many black supervisors.  (Long Dep. 302-03.)

meeting, the group of black employees were labeled "troublemakers" by Mr. Priest.  (Hall Decl. (Doc. # 73, Attach. 8); Long Dep. 258.)

Subsequently, Mr. Priest began documenting incidents between himself and his subordinates, particularly Mr. Long.  (Priest Dep. 90.)  When asked why he documented on a daily basis, Mr. Priest replied: "Because of the hostilities that I was experiencing with Jimmie Lee [Long] and the anger issues.  And he would always go and call Commissioner Dudley over, and Commissioner Dudley would, you know, come down on us." (Priest Dep. 90.)  Mr. Dixon contends that Mr. Priest followed him around and documented his actions in an attempt to write up illicit acts.  Mr. Dixon testified that Mr. Priest "constantly stayed out there on my job daily."  (Dixon Dep. 92; Long Dep. 257 (testifying that "Norman [Priest] come around there and he kept on harass [sic] us so much").)  Roysell Moffett, a truck driver for the Highway Department, testified that in mid-2007, he saw Mr. Priest following closely behind Mr. Long "just watching and harassing him."  (Moffet Decl. (Doc. # 73, Attach. 5).) Frank Hall, a mechanic with the Commission for seven years, testified that Mr. Priest often left the shop in the mornings to "'check out'" Mr. Long and Mr. Dixon on their jobs.  (Hall Decl.)  In one case, Mr. Priest resorted to photographic "surveillance," taking a picture of Mr. Long for not wearing a safety vest while on the road.  (Priest Dep. 76.)  Mr. Long stated multiple times during his deposition that he refused to sign disciplinary warnings because "the only thing [they were] trying to do is stack [his] file."  (Long Dep. 118, 197.)

Mr. Priest increased his "surveillance" of both Mr. Dixon and Mr. Long after he was

informed that his position as superintendent would not be funded the following year.  (Priest

Dep. 38.)

**E.    Mr. Long's Termination**

Mr. Long has a thick personnel file.  From June 2001 to March 2005, Mr. Long's

Personnel File shows several Warnings and Formal Counseling Reports. (Long Personnel

File Pt. 1, at 33-54 (Long Doc. # 36, Attach. 10).)  Mr. Long's purported conduct that led to

these reprimands included walking out of meetings with supervisors, not cooperating with

supervisors, having a negative attitude, showing disrespect to his immediate supervisor,

deliberately misrepresenting statements of supervisors, not following proper procedure for

turning in work orders, and abusive personal conduct.  (Long Personnel File Pt. 1, at 33-54.)

Mr. Long refused to sign all but one of these reprimands (and contends that he was duped

into signing the other), and testified that the underlying facts that led to all of these

reprimands are simply not true.  (Long Dep. 200-201.)  Mr. Long steadfastly maintains that

these reprimands were an attempt to "stack [his] file."  (Long Dep. 197.)

In July 2005, Mr. Long was suspended without pay for "[f]lagrant violation of safety

practices" and "violation of directions given by a supervisor."  (Long Personnel File Pt. I, 14-

29; Long Dep. 216.)  The incident report states that one of Mr. Long's crew members, Jerry

Porter, discovered a defective tire on the chipper, which was brought to Mr. Long's attention.

Mr. Long allegedly directed Mr. Porter "to drive it until it blows out." (Long Personnel File

Pt. I, 15.)  Mr. Long was subsequently suspended for two weeks without pay in a suspension

notice signed by Ted Talley.  (Long Dep. 216.)  Mr. Long refused to sign the suspension notice and denies ordering Mr. Porter to operate the chipper. (Long Dep. 223-24.) Mr. Long requested a review board to meet concerning his suspension, but no meeting was held. (Long Dep. 222-23.)  Mr. Long eventually brought the matter to the Commission, which, approximately one year later, overturned Mr. Long's suspension and awarded him pay for those two weeks. (Long Dep. 222-223.)

The incident that led to Mr. Long's termination occurred in September 2007.  Mr. Priest, conducting surveillance, spotted Mr. Long leaving his work site at 12:30 p.m., around lunchtime.  Mr. Long testified that he was running an errand to the Sheriff's Office, at the request of one of the county commissioners.  (Long Dep. 237.)  Mr. Long had ordered his crew to stop cutting grass and to take lunch, because one of the grass-cutters had no oil in it. (Long Dep. 244.)  Mr. Priest waited at the work site approximately thirty minutes for Mr. Long to return, and meanwhile had directed Mr. Long's crew to resume working.  (Long Personnel File Pt. 1, at 9.)  When Mr. Long did return around 1:00 p.m., he and Mr. Priest had an oral altercation. Mr. Priest was reprimanding Mr. Long for leaving his work site; Mr. Long was countering that he was told to go to the Sheriff's Office by a county commissioner. (Long Dep. 241.)  It was at this time of high tension that Mr. Priest photographed Mr. Long and reprimanded him for not wearing his safety vest in the road.  (Priest Dep. 116.)  The heightened tension of this particular situation, the constant harassment on the part of Mr. Priest, and Mr. Priest's further provocation of Mr. Long by photographing him for a safety

violation as they were arguing about another completely unrelated issue, allegedly caused Mr. Long to respond physically.

Mr. Priest stated in his report that Mr. Long shoved him against his truck. (Long Personnel File Pt. 1, 10.) Later, he claimed in an interview with interim County Engineer Harry Ennis that Mr. Long told Commissioner Mervin Dudley that he was going to shoot Mr. Priest with his gun, which he kept in his truck.[9] (Ennis Dep. 25.) Mr. Priest filed a police report with the Russell County Sheriff's Department a full week after the incident. (Police Report (Long Doc. # 36, Ex. M).) The police took statements from Mr. Priest and Lee Upshaw, who was present during the confrontation. Although Mr. Upshaw initially confirmed in the police report that he heard Mr. Long tell Commissioner Dudley that he was going to shoot Mr. Priest, he later testified to having not heard any kind of threat made by Mr. Long toward Mr. Priest. (Upshaw Dep. 25-29 (Long Doc. # 45, Ex. 4).) All of the crew members who made statements soon thereafter only referred to Mr. Long "point[ing] his finger in [Mr. Priest's] face" or "pull[ing] up and put[ting] his finger in Norman Priest['s] face and [Mr. Priest] just went back to his truck." (Long Personnel File Pt. 1, at 12-13.) Furthermore, the person to whom Mr. Long allegedly made the comment, Commissioner Dudley, denies that Mr. Long made any kind of threatening comment directed at Mr. Priest. (Dudley Dep. 35 (Long Doc. # 45, Ex. 1).)

---

[9] Mr. Long served as an auxiliary deputy sheriff with the Russell County Sheriff's Department. (Long Dep. 254; Ennis Dep. 38.)

Mr. Long was suspended without pay by Defendant Harry Ennis, pending an investigation. (Long Personnel File Pt. I, 7; Ennis Dep. 41 (Long Doc. # 46, Ex. 2).) Mr. Ennis's investigation involved reviewing Mr. Long's personnel file and interviewing Mr. Priest, Mr. Long, Mr. Upshaw, and possibly Fletcher James. (Ennis Dep. 39, 41.) Beyond this, Mr. Ennis testified that he took no further action to investigate the incident. (Ennis Dep. 45.) Ultimately, Mr. Long was terminated by Mr. Ennis on October 5, 2007. (Long Personnel File Pt. 1, at 7.) Mr. Long requested a hearing before the Russell County Personnel Review Board on September 26, 2007. He received a letter on November 2, 2007, dated October 11, 2007, stating that his hearing was set for November 8, 2007. (Long Dep. 284-89.) Mr. Long immediately retained counsel, who requested additional time to prepare for the hearing. His request was denied, and the hearing went forward on November 8, 2007. Mr. Long's witnesses were prevented from entering the hearing chamber, and Mr. Long was prevented from offering witnesses or cross-examining County witnesses. (Long Dep. 294-296.) The hearing lasted five minutes, after which the Personnel Review Board voted unanimously to uphold Mr. Long's termination. (Long Personnel File Pt. 1, at 6.)

## F.   Mr. Dixon's Termination

The first time Mr. Dixon was disciplined for work-related conduct occurred in July 2007, shortly after the meeting with the Commissioner. (Dixon Dep. 80.) Mr. Priest and Mr. Dixon got into an oral altercation about a piece of equipment, during which they both raised their voices. (Dixon Dep. 80-81.) Mr. Dixon received a written warning, signed by Mr.

Priest and Mr. Gohde, for "attitude, misconduct, lack of cooperation, . . . [and] gross insubordination." (Dixon Dep. 89.) The written warning was not shown to or signed by Mr. Dixon. (Dixon Dep. 88, 132-33, 138 (testifying that "[t]hat's the first I've seen that, ma'am, since Norman Priest wrote that up").)

Mr. Dixon testified that after the incident for which he was written up, "[Mr. Priest] just started hounding [him] everyday." (Dixon Dep. 94.) He testified that Mr. Priest denied him necessary equipment, and then complained about the pace of the projects. (Dixon Dep. 95, 98-99, 284-86.) He further testified that Mr. Priest talked to white employees in a more respectful manner. (Dixon Dep. 126.) Mr. Dixon complained to three commissioners that Mr. Priest was trying to get him fired. (Dixon Dep. 150-51.) They told him to settle down, and that they would look into it. (Dixon Dep. 151, 154-55.)

Both Mr. Priest and Mr. Gohde left the Highway Department in September 2007. (Priest Dep. 129-130, 299.) However, Mr. Dixon did not notice any changes for the better. (Dixon Dep. 137.) He was written up by Mr. Calhoun on two more occasions, once for sending home an inebriated subordinate employee without receiving proper permission to do so, and second for sleeping on the job. (Dixon Dep. 163, 211-12, 223-24.) Mr. Dixon contends that he only told the subordinate that he could not "go out there on the work project . . . intoxicated like that," and that he followed all proper procedures. (Dixon Dep. 211-16.) He also denies sleeping on the job, a denial corroborated by two of Mr. Dixon's work crew. (Dixon Dep. 229-32; Owens Decl. (Doc. # 73, Attach. 7); Rudd Decl. (Doc. # 73, Attach.

10).)

On June 24, 2008, the new County Engineer, Larry Kite, called Mr. Dixon to his office and informed him that he was being terminated as a result of his three write-ups. (Dixon Dep. 234-36.)  Pursuant to Highway Department policy, three write-ups mandates termination.

## G.   Procedural History

Mr. Dixon filed suit on February 4, 2009 (Compl. (Doc. # 1)), alleging that the Commission violated his Fourteenth Amendment equal protection rights by "ratifi[ng], condon[ing], and adopt[ing] the unlawful harassment, discrimination, and retaliation perpetrated by . . . Priest, Goahde [sic], Ennis, Camp[,] and Kite, thereby elevating such conduct to an official policy or custom of the County."  (Am. Compl. ¶¶ 15-24.)

Mr. Long filed suit on February 3, 2009 (Compl. (Long Doc. # 1)), alleging similar violations of his Fourteenth Amendment equal protection rights by the Commission and Mr. Ennis.  Mr. Long also brings claims under Title VII against the Commission, having filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and received a right-to-sue letter.  (Long Compl., Ex. B.)

Mr. Dixon's case and Mr. Long's case were consolidated (Doc. # 44), and Defendants have moved for summary judgment.

16

# IV.  DISCUSSION

## A.  Section 1983 Fourteenth Amendment Racial Discrimination (Equal Protection)

### 1.  Generally

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law [or] a suit in equity . . . .

42 U.S.C. § 1983.

A county can be "liable under section 1983 only for acts for which [the county] is actually responsible." *Marsh v. Butler Cnty.*, 268 F.3d 1024, 1027 (11th Cir. 2001) (*en banc*).  Thus, a plaintiff seeking to establish county liability under § 1983 must "identify a [county] 'policy' or 'custom' that caused [his] injury." *Grech v. Clayton Cnty., Ga.,* 335 F.3d 1326, 1330 n.6 (11th Cir. 2003) (quoting *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998)); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) ("[I]t is when execution of a [county's] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [constitutional] injury that the [county] as an entity is responsible under § 1983.").

To establish a claim under § 1983 against Mr. Ennis in his individual capacity, Mr. Long must show: (1) a violation of a constitutional right and (2) that the violation was committed by a person acting under color of state law. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*,

526 U.S. 40, 49-50 (1999).  Plaintiffs' claims fail because there is no constitutional violation.

Because evidence is lacking of a constitutional violation, Plaintiffs cannot show a basis on

which to establish municipal liability against the County.   As a consequence, the issue of

qualified immunity, raised by Mr. Ennis, need not be reached.

A *prima facie* case for race discrimination under the Fourteenth Amendment's Equal

Protection Clause may be established in two ways: (1) by presenting direct evidence of

discrimination or (2) by presenting circumstantial evidence using a variation of the four-part

test delineated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).  *See Bryant v.*

*Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009) (noting that § 1983 equal protection claims

and Title VII discrimination claims are subject to the same standards of proof and the same

analytical framework); *see also Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d

1354, 1358 (11th Cir. 1999) (noting that *prima facie* discrimination case can be established

directly or indirectly).  Once a plaintiff establishes a *prima facie* case, the burden shifts to the

employer "to 'articulate some legitimate, nondiscriminatory reason' for the adverse

employment action."  *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008) (quoting

*McDonnell Douglas*, 411 U.S. at 802).  If the employer meets its burden, the burden shifts

back to the plaintiff to show that the employer's stated reason for the adverse employment

action was "pretext" for discrimination.  *Id*.  The pretext inquiry requires a determination,

based upon the totality of the evidence, as to whether the plaintiff "'has cast sufficient doubt

on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to

conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct.'" *Id.* (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)). A plaintiff may meet his or her burden with the evidence used to establish his or her *prima facie* case. *Combs*, 106 F.3d at 1528.

### 2.    *Direct Evidence of Discrimination*

Direct evidence of discrimination is "'evidence that, if believed, proves the existence of a fact without inference or presumption.'" *Dixon v. Hallmark Companies, Inc.*, - - - F.3d - - -, 2010 WL 4983663 at *3 (11th Cir. Dec. 9, 2010) (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004). "'[D]irect evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.'" *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 639 (11th Cir 1998) (quoting *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990)). The evidence must show "that the complained-of employment decision was *motivated* by the decisionmaker's [racism]." *Damon*, 196 F.3d at 1358-59. Thus, "'only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [race]' will constitute direct evidence of discrimination." *Dixon*, 2010 WL 4983663 at *3 (quoting *Wilson*, 376 F.3d at 1086).

"Remarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (internal quotation marks and citation omitted)). Hence, the

19

Eleventh Circuit "require[s] that a biased statement by a decisionmaker be made concurrently with the adverse employment event, such that no inference is necessary to conclude that the bias necessarily motivated the decision." *Williamson v. Adventist Health Sys./Sunbelt, Inc.*, 372 Fed. App'x. 936, 940 (11th Cir. 2010).

Mr. Dixon and Mr. Long contend they have presented direct evidence of discrimination to satisfy their *prima facie* burdens. Both Mr. Dixon and Mr. Long rely on Mr. West's testimony that he overheard Mr. Gohde say that there were "too many black supervisors," as well as evidence that Mr. Priest inquired into whether all the supervisors were black and later stated that "he had been brought in to straighten things out."[10]

The inquiry into the racial makeup of the supervisors and the statement by Mr. Priest that he was sent to "straighten things out" do not evince an intent to discriminate. On the other hand, the statement by Mr. Gohde regarding "too many black supervisors" does reflect a discriminatory attitude that, if directly correlated to the complained-of discrimination, would amount to direct evidence of discrimination. To meet their burdens, Mr. Dixon and Mr. Long must connect Mr. Gohde's discriminatory statement to the discriminatory conduct

---

[10] Defendants maintain that this evidence is "so contradictory and speculative that it is unworthy of credence." (Def.'s Reply Br. 3 (Doc. # 78).) Specifically, Defendants point to Mr. Long's testimony that F.O. Hall told Mr. Long that he had overheard *Mr. Priest* say that there were too many black supervisors (Long Dep. 302-03), and that there are different accounts of when Mr. Priest was overheard saying "he was sent there to straighten things out." (*Compare* Long Dep. 235-36 (stating that he overheard Priest make the statement at the shop), *with* Hall Aff. (stating that Mr. Priest made the statement while smoking a cigarette with Mr. Hall and Jeff Willis).) However, viewing the evidence in the light most favorable to Plaintiffs, it is not clear whether these statements are, in fact, contradictory, as it is entirely possible that these statements were made on more than one occasion. Furthermore, Mr. West's affidavit is worthy of credence, as it was based on personal observation and corroborated by Mr. Dixon's testimony. Thus, the court finds Defendants' arguments in this regard unpersuasive.

(*i.e.*, their respective terminations). *See Holifield v. Reno*, 115 F.3d 1555, 1563-64 (11th Cir. 1997) ("The biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case.") (internal quotation marks and citation omitted).

The alleged discrimination amounts to a plan, scheme, or conspiracy involving several county engineers and mid-level supervisors to terminate Mr. Dixon and Mr. Long on the basis of their race. While the evidence of Mr. Gohde's statement regarding "too many black supervisors" is "probative circumstantial evidence of [Mr. Gohde]'s state of mind," *Damon*, 196 F.3d at 1359, the comment requires several inferential leaps to reach the conclusion that *Mr. Gohde*'s discriminatory state of mind motivated Mr. Priest's and Mr. Calhoun's decisions to "write up" Mr. Dixon on three separate occasions (one by Mr. Priest, and two by Mr. Calhoun), which ultimately led to Mr. Kite's decision to terminate him. The same inferential leaps would be required to link Mr. Gohde's discriminatory state of mind to Mr. Priest's decision to write up Mr. Long on September 18, 2007, which led to Mr. Ennis's decision to terminate him.

Plaintiffs argue that Mr. Gohde and Mr. Priest "engaged in a concerted effort to wrongfully discharge [them]." (Pls.' Resp. Br. 11.) However, Plaintiffs fail to present any evidence that Mr. Gohde relayed his discriminatory motives to Mr. Priest or that he instructed Mr. Priest to find ways to terminate black supervisors for the purpose of opening up positions for white supervisors. Rather than presenting evidence that Mr. Priest had any knowledge

of Mr. Gohde's biased intentions, Plaintiffs ask the court to infer this discriminatory plan from Mr. Priest's statement that "he had been brought in to straighten things out" and the fact that Mr. Priest seems to have been an unpleasant supervisor.

However, even if the court were to find that Mr. Gohde's statement was direct evidence of a plan between Mr. Gohde and Mr. Priest to terminate black supervisors, this alleged plan led, at most, *indirectly* to Mr. Dixon's and Mr. Long's eventual terminations. Mr. Gohde did not terminate Mr. Dixon or Mr. Long; his replacements, Mr. Kite and Mr. Ennis, did.  There is no evidence that Mr. Gohde communicated his intentions to Mr. Kite or Mr. Ennis or otherwise notified either of them of the Highway Department's "plan" to terminate black supervisors, and there is no evidence of any discriminatory statements or conduct on the part of Mr. Kite or Mr. Ennis.  Further, with respect to Mr. Dixon, Mr. Priest's actions resulted in only one of the three disciplinary write-ups that eventually led to Mr. Dixon's termination; Mr. Priest's replacement, Mr. Calhoun, prepared the other two write-ups.  There is no evidence that Mr. Priest communicated any improper intentions to Mr. Calhoun, or otherwise notified Mr. Calhoun of a plan to terminate black supervisors.  In other words, there is no evidence that the alleged plan between Mr. Gohde and Mr. Priest permeated the whole department, or that it guided Mr. Calhoun's or Mr. Kite's actions in any way.

Moreover, there is no evidence that Mr. Priest's actions, alone, tainted the decisionmaking process with respect to Mr. Dixon.  According to Mr. Dixon, the

discriminatory plan between Mr. Gohde and Mr. Priest began to take effect when, in July 2007, Mr. Priest wrote up Mr. Dixon for insubordination after a verbal altercation. Because this first write-up was one of the three write-ups that ultimately led to Mr. Dixon's termination, it is arguable that Mr. Priest's actions played a part in Mr. Dixon's termination: Without Mr. Priest's written disciplinary report, Mr. Dixon would not have had three write-ups, and without the three write-ups, Mr. Kite would not have been obligated, pursuant to department policy, to terminate Mr. Dixon. Thus, it is particularly significant that Mr. Dixon does not deny that this "loud exchange" occurred, or that the incident constituted a violation of department policy warranting disciplinary action. Mr. Dixon's concession in this regard shows that the termination was not based on false information provided by Mr. Priest to the decisionmaker, Mr. Kite. *See Wright v. Southland Corp.*, 187 F.3d 1287, 1304 n.20 (11th Cir. 1999) ("[T]here is no evidence that [the plaintiff's supervisor's predecessor] manipulated the decisionmakers, and thus any discriminatory intent on his part could not be said to be the cause of [the plaintiff's] termination.").

Mr. Long's termination, on the other hand, is directly attributable to Mr. Priest. Mr. Long's altercation with Mr. Priest occurred on September 18, 2007. Mr. Long worked his last day on September 24, 2007, and was terminated less than a month after the incident, on October 5, 2007. (Long Personnel File Pt. I, 7.) The reason stated for Mr. Long's termination was "[v]iolation of County standards, on group two offenses." Those group two offenses are enumerated in his written warning issued by Mr. Priest. On this record,

however, Mr. Priest's involvement is insufficient to sustain Mr. Long's racial termination claim. Mr. Priest was not the final decisionmaker; Mr. Ennis was. And there is not evidence of any improper influence by Mr. Priest in that decision.

Although the issue was not raised, it should be noted that a cat's paw theory cannot save Mr. Long's claim. The cat's paw theory applies where an employee demonstrates that "the decisionmaker followed the biased recommendation [of a non-decisionmaker] without independently investigating the complaint against the employee." *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999). In such an instance, "the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." *Id.* Causation between the recommender's discriminatory animus and the adverse employment action, however, "must be truly direct." *Id.* The "discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, [must be] an actual cause of the other party's decision to terminate the employee." *Id.* Application of the cat's paw theory in Mr. Long's case is unwarranted for two reasons. First, as discussed, Mr. Long has failed to produce evidence of racial animus on the part of the arguable recommender, Mr. Priest. Second, even if there existed evidence against Mr. Priest, there would not be enough evidence, on this record, of a causal connection between that discriminatory animus and Mr. Ennis's ultimate decision to terminate Mr. Long; causation under the cat's paw theory depends largely on the action (or inaction) of the final decisionmaker and requires that the

connection "be truly direct." *Stimpson*, 186 F.3d at 1332.

Unlike Mr. Dixon, Mr. Long adamantly disputes virtually everything that found its way into Mr. Priest's write-up. (Long Dep. 238-250.) Mr. Ennis, the decisionmaker, relied heavily on Mr. Priest's version of the incident. However, Mr. Ennis did not rely *solely* on Mr. Priest's account. Rather, he conducted an independent investigation, reviewing Mr. Long's personnel file, interviewing Mr. Priest, Mr. Long, Mr. Upshaw, and possibly Fletcher James, and examining the police report of the incident. (Ennis Dep. 24-50.) Because Mr. Ennis conducted an independent investigation, any argument based upon a cat's paw theory would have been futile for lack of causation.

In spite of Mr. Priest's involvement in the circumstances which led to Mr. Long's termination, Mr. Long has failed to properly link Mr. Gohde's racial animus to Mr. Priest, *supra* at 20-22, as required to link Mr. Priest's alleged racial animus to Mr. Ennis. For this reason, Mr. Long cannot sustain his direct evidence claim of racial discrimination on a cat's paw theory.

In sum, although Mr. Gohde's statement indicates a racist state of mind, the court must make several inferential leaps which are unsupported by evidence sufficient to raise a genuine issue of material fact that Mr. Gohde's bias "necessarily motivated the decision" to fire Plaintiffs.[11] *Williamson*, 372 Fed. App'x. at 940. Thus, the court finds that the statement

---

[11] Plaintiffs have neither presented any argument in this regard, nor cited any case law supporting their position. They simply state that "there is substantial direct evidence to racial animus having played a significant role in their terminations," (Pls.' Resp. Br. 23), and assume that the evidence speaks for itself. It does not.

related to "too many black supervisors" does not constitute direct evidence of discrimination sufficient to raise a genuine issue of material fact, and that Mr. Dixon and Mr. Long must prove their discrimination claims circumstantially, using the *McDonnell Douglas* framework.

### 3. *Circumstantial Evidence*

To establish a *prima facie* case of disparate treatment on the basis of race, each Plaintiff must show: (1) he is a member of a protected class; (2) he was qualified for the job; (3) he suffered an adverse employment action; and (4) Defendants treated similarly situated employees outside the protected class more favorably. *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999); *McDonnell Douglas Corp.*, 411 U.S. at 802. "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Holifield*, 115 F.3d at 1562.

Mr. Dixon's and Mr. Long's claims falter on the fourth element. As to this element, Plaintiffs must present evidence that a white employee was "involved in or accused of the same or similar conduct and [was] disciplined in [a] different way[ ]." *Holifield*, 115 F.3d at 1562. The white employee must be "similarly situated in all relevant respects." *Id.* The Eleventh Circuit has interpreted this standard to "require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia*, 171 F.3d at 1368.

Rather than address Defendants' arguments in this regard, Mr. Dixon and Mr. Long simply state that they "can prove a prima facie case of discrimination." (Long Doc. # 43, at 25; Doc. # 70, at 25.)  They do not, however, offer any argument or cite any case law in support of that conclusory contention.  Plaintiffs provide twenty pages of facts and a short statement of the law, and then, without applying the facts to the law, conclude that they have met their burden in overcoming summary judgment, presumably leaving the court to make their arguments.  There, however, "is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995). The court nonetheless has reviewed the record, and finds that neither Mr. Dixon nor Mr. Long has presented sufficient evidence to create a genuine issue of material fact as to the fourth element of their respective *prima facie* cases.  Because the claims fail on the fourth element, it is unnecessary to apply the *McDonnell Douglas* analysis.

Even if Mr. Dixon or Mr. Long were able to make out a *prima facie* case, their claims would still fail for a complete absence of pretext.  For example, as to Mr. Long, his lengthy personnel file, which chronicles almost a decade of infractions, offers more than enough evidence to support Defendants' articulated nondiscriminatory reason for terminating him. (Defs.' Resp. 12, 15-16.)  The burden would again be on Mr. Long to prove pretext.  To demonstrate pretext, Mr. Long merely states that any argument by the Commission that it fired Mr. Long based on a reasonable belief that he violated policies and procedures of the

Russell County Engineer's Office "rings hollow when compared with the evidence in these cases."  (Long Doc. # 43, at 26.)  Mr. Long fails, however, to specifically point to any evidence of pretext.  Mr. Long's repeated statements that his personnel file was stacked (Long Dep. 118, 197), without supporting evidence, do not demonstrate pretext.

### 4.   *Summary*

The § 1983 equal protection claims against the Commission and Mr. Ennis, in his individual capacity, alleging racially discriminatory terminations, are not supported by the evidence.  There is no direct evidence of discriminatory intent, and circumstantially, the evidence is insufficient to raise a genuine issue of material fact that Plaintiffs suffered discrimination because of their race.  It is, therefore, unnecessary to inquire into the Commission's customs or policies pertaining to employment practices, *see Garczynski v. Bradshaw*, 573 F.3d 1158, 1170 (11th Cir. 2009) ("Analysis of a state entity's custom or policy is unnecessary . . . when no constitutional violation has occurred."), or into Mr. Ennis' defense of qualified immunity.  Accordingly, summary judgment for Defendants is due to entered on the § 1983 claims alleging racial discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment.

### B.   Title VII Race Discrimination

Mr. Long also seeks relief under Title VII, which prohibits employment discrimination on the basis of race.  *Ricci v. DeStefano*, 129 S. Ct. 2658, 2672 (2009).  A disparate treatment claim under Title VII "occurs where an employer 'has treated [a]

28

particular person less favorably than others because of' a protected trait." *Id.* (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 985-86 (1988)). Proving a violation of § 1983 (equal protection) and Title VII, where the facts for each claim are the same, involves the same standards and analytical framework. *Bryant*, 575 F.3d at 1296 n.20; *Crawford*, 529 F.3d at 970. Thus, with respect to Mr. Long's Title VII race discrimination claim, the court adopts its analysis and conclusion from its discussion of his § 1983 race discrimination claims, *see supra* pt. A. Therefore, Mr. Long's Title VII race discrimination claim fails.

## C.   Retaliation Claims and the Fourteenth Amendment's Equal Protection Clause

Mr. Dixon and Mr. Long purport to bring § 1983 retaliation claims under the Equal Protection Clause of the Fourteenth Amendment. (*See* Dixon Am. Compl. ¶¶ 15-24; Long Compl. ¶¶ 14-20.) However, "a pure or generic retaliation claim . . . simply does not implicate the Equal Protection Clause." *Watkins v. Bowden*, 105 F.3d 1344, 1355 (11th Cir. 1997) (collecting cases). Mr. Dixon effectively concedes this point in his response brief, arguing only that *Mr. Long*'s retaliation claim was also brought under Title VII, without addressing his own Fourteenth Amendment retaliation claim. Accordingly, Defendants' motions for summary judgment on Plaintiffs' Fourteenth Amendment retaliation claims are due to be granted. Mr. Long's Title VII retaliation claim will be taken up below.

## D.   Title VII Retaliation

Title VII prohibits discrimination against any employee who (1) "has opposed any practice made an unlawful employment practice by this subchapter" (opposition clause), or

(2) "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter" (participation clause). 42 U.S.C. § 2000e-3(a). "The burden of proof in Title VII retaliation cases is governed by the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162-63 (11th Cir. 1993) (citation altered). A *prima facie* case of retaliation requires proof "(1) that [the employee] engaged in statutorily protected expression; (2) that he suffered an adverse employment action; and (3) that there is some causal relation between the two events." *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (rhr'g en banc denied). Under the opposition clause, to show engagement in statutorily protected expression, the employee must show that he engaged in (1) opposition and (2) "that he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices [under Title VII]." 42 U.S.C. § 2000e-3; *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1213 (11th Cir. 2008) (quoting *Little*, 103 F.3d at 960); *see also* 42 U.S.C. § 2000e-2(a) (listing race, color, religion, sex, or national origin as protected statuses).

After the plaintiff has established the elements of the *prima facie* case, the employer has the burden of articulating a legitimate non-retaliatory reason for the challenged employment action. *Goldsmith*, 513 F.3d at 1277. Ultimately, the plaintiff bears the burden of proving retaliation by a preponderance of the evidence and that the reason provided by the employer was pretextual. *Id.*

To satisfy the burden of production for offering a legitimate, non-retaliatory reason for its actions, the employer is not required to persuade the court that the reason was its actual motivation. *Combs*, 106 F.3d at 1528 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981)). The employer only needs admissible evidence that would allow the trier of fact to rationally conclude that its actions were *not* based on a retaliatory motive. *See id.* (quoting *Burdine*, 450 U.S. at 257).

When the employer satisfies its burden, the employee has the burden to establish that the employer's non-retaliatory reason was pretextual. The plaintiff must meet the employer's legitimate reason "head on" and not by "simply quarreling with the wisdom of that reason." *Chapman v. Al Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc). To meet the evidentiary burden on pretext, the employee must demonstrate "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason for its actions that a reasonable factfinder could find it unworthy of credence.'" *Combs*, 106 F.3d at 1538 (quoting *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1071 (3d Cir. 1996) (en banc)).

### 1.    *Mr. Long's Opposition Retaliation Claims and Prima Facie Case*

Mr. Long has four distinct claims of retaliation based on his participation in and opposition to unlawful employment practices at the Commission. One is time-barred, two do not state a *prima facie* case of retaliation because Mr. Long did not engaged in statutorily

31

protected expression, and the final claim (a participation claim) lacks the requisite causal connection.

### a.    Cal Markert Interview

Mr. Long's first retaliation claim concerns his interview for the superintendent position in late-2003, when Buster Sanders retired from the position. Mr. Long alleges that County Engineer Cal Markert retaliated against him by failing to promote him to the position of superintendent because he had previously confronted Mr. Markert about racial discrimination.

The merits of this claim need not be addressed, as it is clearly time-barred. The Supreme Court of the United States has held that a continuing violation theory is not permitted for claims arising out of discrete acts of discrimination, such as termination, failure to promote, denial of transfer, or refusal to hire. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002). "Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice'" that may start a new limitations period for filing a charge. *Id.* Nearly four years elapsed between accrual of Mr. Long's failure to promote claim and the date on which he filed an EEOC charge. Mr. Long's Title VII retaliation claim for failure to promote is time-barred. *See* 42 U.S.C. § 2000e-5(e)(1) ("A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . . .").

  b.  **The July 2007 Meeting and Mr. Long's Termination and Appeal**

  Second and third, Mr. Long maintains that he was terminated and that he was denied a meaningful appeal by the personnel review board in retaliation to a July 2007 meeting at which he and several other African-American employees complained of discrimination and unequal treatment. To sustain the first element of his *prima facie* retaliation case as to these claims, Mr. Long must demonstrate that he engaged in statutorily protected expression. To do so, he must allege that he engaged in (1) opposition, and (2) "that he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices [under Title VII]." 42 U.S.C. § 2000e-3; *Butler*, 536 F.3d 1209, 1213 (quoting *Little*, 103 F.3d at 960); *see also* 42 U.S.C. § 2000e-2(a) (listing race, color, religion, sex, or national origin as protected statuses). Finding that Mr. Long did not "oppose" within the meaning of the law, the court truncates the discussion of the other elements of Mr. Long's purported statutorily protected expression, and his *prima facie* case generally.

  In *Crawford v. Metropolitan Government of Nashville and Davidson County, Tennessee*, the Supreme Court recently considered what may constitute opposition in the context of a Title VII retaliation claim. 129 S.Ct. 846, 851 (2009). In that case, the Supreme Court held than an employee's speech about sexually harassing behavior in response to an employer's internal investigation constituted opposition under the Title VII retaliation framework. The Court defined the term "oppose" as follows: "[B]eing left undefined by statute, [oppose] carries its ordinary meaning, 'to resist or antagonize . . ., to contend against;

to confront; to resist; withstand[.]'" *Id.* (citing *Perrin v. United States*, 444 U.S. 37, 42 (1979) (quoting Webster's New International Dictionary 1710 (2d ed. 1958)). The Court then found that the plaintiff's account of a fellow employee's sexually harassing behavior, a description including crotch grabbing, "put[ting] his crotch up to her window," and "grabb[ing] her head and pull[ing] to his crotch," was "an ostensibly disapproving account of sexually obnoxious behavior toward her by a fellow employee" and therefore "covered by the opposition clause." *Id.* at 849-50. The Court further held that even though plaintiff's speech came as a response to an employer's question, it still constituted opposition just as "standing pat, say, by refusing to follow a supervisor's order to fire a junior worker for discriminatory reasons" constitutes opposition. *Id.* at 851.

Mr. Long contends that his opposition occurred during a July 2007 meeting, wherein Mr. Long, Mr. Dixon, and four other African-American employees met with LeAnn Horne, the County Administrator, County Commissioners Mervin Dudley and J.D. Upshaw, and the County Attorney to discuss grievances within the Highway Department. (Long Dep. 257-59.) County Attorney Kenneth Funderburk confirmed in his deposition that this meeting took place.[12] (Funderburk Dep. 40-47 (Doc. # 72, Attach. 15).)

Plaintiff concedes that race was never mentioned during the meeting. (Pl.'s Br. 11-12.) Nevertheless, counsel for Mr. Long asserts that "it is undisputed the grievants all claimed discrimination and unequal treatment." (Pl.'s Br., 11-12.) This assertion, however,

---

[12] Mr. Funderburk also confirmed that he unilaterally destroyed the taped recordings made during this meeting, because he believed that the claims were without merit. (Funderburk Dep. 46.)

34

is not accompanied by a record cite, and "arguments in brief are not evidence." *United States v. Cardona*, 302 F.3d 494, 497 (5th Cir. 2002). Contrary to counsel's argument that discrimination was explicitly mentioned, the evidence appears to be incongruous with his statement. (Horne Dep. 33 (Doc. # 72, Attach. 14) ("No, they just didn't like their work assignments. I don't recall [them saying they were] being discriminated against."); Funderburk Dep. 43 ("[T]here wasn't one single person who had anything to say dealing with discrimination or being treated unfairly . . . ."); Dudley Dep. 100 ("I took the comments as being the type of comments, if you had a staff meeting, suggestions from your employees or co-employees, on what we can do to improve the operation of what we're doing, what we're there for.").)[13] Mr. Long did not testify as to the substance of what he said during the meeting, only stating ambiguously that "[i]f you come up with that tape, you're going to come all are on that tape, each one I said,"[13] and that "[e]ver since [that meeting] – we class as troublemakers." (Long Dep. 258, 262.) Furthermore, Mr. Dixon, the only employee to testify as to what he actually said during that meeting, stated in his deposition that he went to the July 2007 meeting to complain about "the working environment, hostile working environment, that we were down there were concerned about the way we were being treated *as employees*." (Dixon Dep. 204 (emphasis added).)

---

[13] Statements or testimony by J.D. Upshaw, the other County Commissioner present, have not been provided.

[13] The court can make no sense of this statement. It is recounted simply to highlight the ambiguity of the claim.

"Even after *Crawford*, to engage in protected actvity, the employee must still, 'at the very least, communicate her belief that discrimination is occurring to the employer,' and cannot rely on the employer to 'infer that discrimination has occurred.'" *Demers v. Adams Homes of Nw. Florida, Inc.*, 321 Fed. App'x. 847, 852 (11th Cir. 2009) (quoting *Webb v. R & B Holding Co., Inc.*, 992 F. Supp. 1382, 1390 (S.D. Fla. 1998); *see also Fields v. Locke Lord Bissell & Liddell, LLP*, No. 1:07cv2984, 2009 WL 2341981, at *14 (N.D. Ga. July 28, 2009). Generalized complaints about working conditions cannot form the basis for a claim of retaliation. *Reynolds v. Golden Corral Corp.*, 106 F. Supp. 2d 1243, 1253-54 (M.D. Ala. 1999).

The evidence reveals that the employees complained only of working conditions and of how they were being treated as employees, not as *African-American* employees. Nevertheless, Mr. Long urges the court to "take judicial notice that when a panel of six black employees petition[s] a governmental body comprised of four white officials in Russell County, Alabama, race is likely a factor motivating the discussion, but may not be a term either party will readily embrace and verbalize."[14] (Pl.'s Br. at 12, n.7.) Granted, race motivates many a discussion, but an employer is put on notice of discrimination by the content of the discussion, not by unspoken motivations. Considering only the setting and players, the employer would, under Mr. Long's theory, be required to *infer* discrimination from generalized complaints. That is a proposition contrary to law and is precisely the type

---

[14] The Commission was actually 43% African-American at the time of the meeting.

36

of inference that the *Demers* court warned against.  Accordingly, there are insufficient facts to establish that Mr. Long engaged in statutorily protected expression opposing unlawful employment practices at the July 2007 meeting.

Mr. Long's *prima facie* case with respect to his termination falls short on another ground as well.  Assuming, *arguendo*, that Mr. Long can sustain the first element of his *prima facie* case, that he engaged in statutorily protected expression, he still cannot demonstrate the required causal link between his opposition and his termination (the third element).  In other words, even if Mr. Long can show that the July 2007 meeting, wherein several African-American employees complained of working conditions without mentioning discrimination or race, constituted adequate opposition to perceived unlawful employment practices, *see Crawford*, 129 S. Ct. at 851, and that Mr. Long both subjectively and reasonably believed that those practices were, in fact, unlawful, *see Butler*, 536 F.3d at 1213-1214, he still cannot tie the two events together to a degree that a causal link can be established.

The Eleventh Circuit has explained that the causal element for a claim of retaliation can be proved by circumstantial evidence.  *Goldsmith*, 513 F.3d at 1277.

> We do not construe the 'causal link' . . . to be the sort of logical connection that would justify a prescription that the protected participation in fact prompted the adverse action.  Such a connection would rise to the level of direct evidence . . . Rather, we construe the 'causal link' element to require merely that the plaintiff establish that the protected activity and the adverse action were not wholly unrelated.

*Id.* (quoting *Simmons v. Camden Cnty. Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985)).

"In order to show the two things were not entirely unrelated, the plaintiff must generally show that the [decisionmaker] was aware of the protected conduct at the time of the adverse employment action." *Id.* (quoting *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) (citing in turn *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997))).  In other words, Mr. Long must show that Mr. Ennis was aware of the June 2007 meeting at the time of his decision to terminate Mr. Long. Otherwise, the causal connection is severed; the protected expression generally can play no role in the adverse employment action if the decisionmaker had no knowledge of the expression.  Because Mr. Ennis became County Engineer after the meeting, his knowledge by no means can be inferred, and Mr. Long does not allege that he had such knowledge.  In fact, Mr. Ennis unequivocally stated several times during his deposition testimony that he was unaware of this meeting.  (Ennis Dep. 21-22.)  Mr. Long has failed to demonstrate the requisite causal link between the June 2007 meeting and his termination and, thus, cannot sustain his *prima facie* case.

Mr. Long also asserts that he was denied meaningful review of his termination before the personnel review board, in retaliation for opposing unlawful employment practices at the July 2007 meeting.  Again, assuming *arguendo* that Mr. Long can sustain the first element of his *prima facie* retaliation case, that he engaged in statutorily protected expression, he has not provided sufficient facts to support a finding that there was a causal link between the July 2007 meeting and the lack of a meaningful review process for his termination.  As stated

above, Mr. Long bears the burden of showing that the review board (the decisionmaker as to the denial of his appeal) was aware of the July 2007 meeting (the alleged protected conduct). *Goldsmith*, 513 F.3d at 1277. Mr. Long has failed to demonstrate that the review board was aware of the July 2007 meeting.

### 2.    *Mr. Long's Participation Retaliation Claim*

Fourth and finally, Mr. Long claims that "evidence of retaliation begins with his EECO [sic] Charge of Discrimination." (Long Doc. # 43, at 31.) The court understands this to mean that the Commission retaliated against him for filing an EEOC Charge of Discrimination. Mr. Long "participated" within the meaning of Title VII by filing his EEOC Charge of Discrimination on December 6, 2007. (Long Doc. # 1, Ex. B); *see also* § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge . . . under this subchapter."). However, Mr. Long's termination was effective on October 5, 2007, and his appeal was denied on November 8, 2007. Simply put, there is no evidence that Mr. Long and the Commission had any dealings subsequent to Mr. Long's filing of his EEOC Charge other than this pending lawsuit. The required causal connection required for a *prima facie* case cannot exist when the protected expression occurred *after* the adverse employment actions. *See Cobb v. TSI Telecomms. Serv., Inc.*, 172 Fed. App'x. 293 at *2 (11th Cir. 2006) ("[I]t is undisputed that [plaintiff's] EEOC charge was actually filed after the decision was made to terminate him. Therefore, there can be no participation claim based on retaliation for filing

the EEOC charge."); *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 741 & 745 (11th Cir. 1996) (affirming summary judgment as appropriate in a First Amendment retaliation case where defendants' testimony showed that the decision to terminate the plaintiff was made earlier that day, before the allegedly protected speech, and therefore defendants had no reason to retaliate against plaintiff at the time the termination decision was made).

Mr. Long has failed to state a *prima facie* case of retaliation under Title VII. Accordingly, summary judgment is due to be entered in Defendants' favor on Mr. Long's Title VII retaliation claim.

## IV.  CONCLUSION

It is ORDERED as follows:

(1)    Defendants' motions for summary judgment on Plaintiffs' § 1983 Fourteenth Amendment equal protection race discrimination claims are GRANTED;

(2)    Defendants' motions for summary judgment on Plaintiffs' § 1983 Fourteenth Amendment retaliation claims are GRANTED; and

(3)    Defendants' motion for summary judgment on Mr. Long's Title VII claims is GRANTED.

An appropriate judgment will be entered.

DONE this 27th day of December, 2010.

　　　　　　　　　　　　　　　　　/s/ W.  Keith Watkins
　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE